## CARY-DAVIS TUG & BARGE CO. v. FOX et al.

Circuit Court of Appeals, Ninth Circuit.
October 17, 1927.

No. 5223.

**1. Bailment ⬡31(3)—Finding of trial court as to cause of fire on tug held supported by evidence.**

Finding of trial court that fire which damaged a tug while being repaired was not caused by any act of the contractor or his employés, but by something which occurred while the tug was in temporary use by the owner, *held* supported by the evidence.

**2. Bailment ⬡14(1)—Provision of contract for doing work on vessel that it shall be returned in as good condition as received does not render contractor liable for injury without his negligence.**

Provision in contract to install fresh-water steel tanks in a tug that the tug shall be returned by contractor in as good condition as received does not render contractor liable for injury to tug occurring without his fault or negligence.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Suit in admiralty by the Cary-Davis Tug & Barge Company against J. H. Fox and William Henry Jenkins, partners doing business as the Commercial Boiler Works. Decree for respondents, and libelant appeals. Affirmed.

Lawrence Bogle, Cassius E. Gates, and R. Kline Hillman, all of Seattle, Wash., for appellant.

Daniel Landon, William H. Pemberton, and Roy D. Robinson, all of Seattle, Wash., for appellees.

Before HUNT, RUDKIN, and DIETRICH, Circuit Judges.

RUDKIN, Circuit Judge. The Commercial Boiler Works entered into a contract with the Cary-Davis Tug & Barge Company, wherein the former agreed to install two fresh-water steel tanks in the aft part of a tug owned by the latter. The contract contained the following stipulations, among others:

"The whole job will be completed by the contractor and the tug returned to the owners in as good condition as it is to-day. Any parts removed by the contractor in order to do this work will be replaced by him. If the contractor by any chance damages the tug in the performance of this work, the damage will be righted by the contractor. * * *

"All work may be done at the wharf of the owners, but, if the contractor prefers to have the work done nearer his works, then the tug will be taken there at the expense of the contractor and the contractor will deliver the tug to the owners when the job is completed."

Work on the installation of the two tanks began about a month after the execution of the contract, and was prosecuted day and night until the tug was damaged by fire about two weeks after the work commenced. The steel plates for the tanks were fabricated in the shops of the boiler works and lowered through the skylight into the engine room of the tug, and were then put in place and the edges of the plates held together by spot welding. Later the plates were welded along the edges by electro welding, so as to unite them and make them water tight. The original contract did not seem to contemplate the use of the tug while the work on the tanks was in progress, but by some subsequent understanding or arrangement the crew was allowed to occupy their living and sleeping quarters in the forward part of the tug and the owner was permitted to use the tug

for short towing services. When the tug was engaged in performing a towing service, work on the tanks was suspended, and upon completion of the service the tug was returned to the dock of the contractors. A towing service was performed by the owner during the evening before the fire, and the tug was returned to the dock as usual at about 6:30 p. m. As soon as the tug was tied up at the dock, the electric welder resumed his work, and was engaged in welding the seams in the tank on the port side of the tug from about 7 o'clock until midnight. During that period there were present on the tug the welder and a friend, who was visiting and in a measure assisting him, and six members of the tug's crew. The welder and his friend were at the tank on the port side in the aft part of the tug, and the members of the crew were in their customary quarters in the forward part. About two hours after the welder ceased work, or about 2 o'clock in the morning, the tug was discovered in flames. The present libel was thereafter filed by the owner to recover the cost of repairs, and from a decree of dismissal the present appeal was prosecuted.

In support of its appeal, the appellant contends, first, that the appellees were in exclusive possession of the aft part of the tug, where the fire started, as bailees, and the burden of proof was upon them to prove the cause or origin of the fire, and that the fire occurred without their negligence; second, that the fire was in fact caused by the negligence of the appellees and their servants; and, third, that under the express terms of the contract between the parties the appellees assumed liability irrespective of negligence, the fire having resulted from work performed by them.

[1] The court below, in a written opinion, found in substance that the testimony strongly preponderated to show that the proximate cause of the fire was not from any spark from the welding, or any act of the welder, either directly or indirectly, but was caused from some condition or substance or material from a creation or contact, while the tug was in the exclusive control of the owner, and that no agency of the contractors in any way contributed to the fire. If this finding is supported by the testimony, the first two contentions of the appellant are of no avail. The question involved is largely one of fact. The case was heard on testimony taken in open court, and is therefore controlled by the familiar rule that findings of fact based on conflicting testimony will not be disturbed, unless clearly shown to be

against the weight of the evidence. The testimony as to the cause or origin of the fire was entirely circumstantial, and was inconclusive as well as somewhat conflicting. That on the part of the appellant tended to show that, when the tug was returned to the dock on the evening before the fire, the fires in the boiler room were extinguished and a part of the crew went to their homes, the remainder retiring to their customary quarters in the forward part of the tug; that about 11:30 the fireman again started the fires for the purpose of keeping up steam, extinguishing them about 20 minutes later, and that after observing the welder for a brief period he retired for the night. Testimony was also offered tending to show that there had been previous smoldering fires in the vicinity of the tanks during the progress of the work; that fire apparatus was kept there for the purpose of extinguishing them; that the place was oily and greasy; that in the process of welding sparks and particles of molten metal would fly and drop for a radius of from 18 inches to 2 feet; that the front part of the tank was lower than the back part, and that the condition of the tug after the fire indicated that the fire had started about 4 feet from the front end of the tank where the welding had been in progress.

The appellees, on the other hand, offered testimony tending to show that the smoldering fires referred to had occurred several days before, when a different device was used for the purpose of cutting and trimming the steel plates; that no fire at any time resulted from the welding process; that all welding done the night of the fire was from 10 to 12 feet from the point where it is claimed the fire originated; that the sparks emitted would not ignite unless in close proximity to wood or other combustible material; that they would not burn after leaving the welding device; that asbestos was placed under the seams of the tanks wherever they came in contact with wood; that the work was conducted in a careful manner; that there was little or no danger from sparks under such circumstances, and that the welder at the close of work made an inspection to see that there was no fire, and that none existed.

There may be other circumstances in the case, but the foregoing is in substance the material testimony upon which the findings of the court below were based, and from a careful review of the testimony we are unable to say that the findings are contrary to the great weight of the evidence, or indeed that they are against the weight of the evidence at all. The best that can be said is

that the cause or origin of the fire is left in doubt and uncertainty and is a mere matter of speculation.

As already stated, the findings dispose of the first two contentions made by the appellant, because the court found that a preponderance of the evidence showed that the fire was not caused by the appellees or by their servants and if this be true they were not responsible, even though they were in the exclusive possession of a portion of the tug as bailees. We might say, however, that under the testimony it is extremely doubtful whether the appellees were in the exclusive possession of any part of the tug within the rule upon which the appellant relies.

[2] Nor is there any merit in the contention that the appellees are liable, regardless of negligence, under the terms of the contract. No doubt a bailee may enlarge his liability by contract, but the provision that the tug should be returned in as good condition as it was that day is a familiar one in leases, charter parties, and other contracts, and almost without exception the courts have held that such provisions are simply declaratory of the obligation implied by law. 6 C. J. 1111; 36 C. J. 200; Mulvaney v. King Paint Mfg. Co. (C. C. A.) 256 F. 612.

The decree of the court below is affirmed.